Ronald A. York vs. Zurich Scudder Investments, Inc.

No. 05-P-976.

Suffolk. March 3, 2006. - June 26, 2006.

Present: Greenberg, Duffly, & Katzmann, JJ.

*Contract,* Employment, Performance and breach, Implied covenant of good faith and fair dealing, Misrepresentation. *Employment,* Termination. *Damages,* Quantum meruit.

In the circumstances of a civil action brought in Superior Court by an at-will employee, seeking recovery of incentive compensation that his former employer had denied him after his termination during a cost-cutting initiative, the judge did not err in granting summary judgment in favor of the employer on the employee's claims of breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, and quantum meruit, where the employee admitted facts that established that he had no reasonable expectation of proving any of his claims or any right to recover posttermination increments of incentive compensation. [614-620]

Civil action commenced in the Superior Court Department on October 11, 2001.

The case was heard by *Nancy Staffier Holtz,* J., on a motion for summary judgment.

*Richard C. Van Nostrand* for the plaintiff.

*Scott A. Roberts* for the defendant.

Katzmann, J. Ronald A. York, who was an at-will employee of Zurich Scudder Investments, Inc., and its predecessors in interest (Scudder), filed suit in Superior Court seeking recovery of incentive compensation he claims was improperly denied him after Scudder terminated him. He alleged counts of breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, and quantum meruit. The judge allowed Scudder's motion for summary judgment on all counts without written opinion, and York appeals. We affirm.

*Background.* York's claims center on incentive compensation

that he argues Scudder should have continued to pay him even after he was terminated in 2000. We summarize the facts in the light most favorable to York. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). However, we note at the outset that where the facts conflict, we consider the statements made by York during his deposition, and not the assertions in his affidavit made two months later. See *Morrell* v. *Precise Engr., Inc.*, 36 Mass. App. Ct. 935, 937 (1994), quoting from *O'Brien* v. *Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993) ("a party cannot create a disputed issue of fact by the expedient of contradicting by affidavit statements previously made under oath at a deposition").

When York began his employment with Scudder in 1990 as a nonsales employee, he was not eligible for the sales incentive compensation program that is at the heart of this lawsuit. However, in 1994, York was recruited to become a sales representative, responsible for selling group retirement plans managed by Scudder. At that point, a manager named Mark Cassidy informed York that as a sales representative his salary would remain the same, but he would receive additional sales incentive compensation. The amount of the incentive compensation, according to Cassidy, would depend on the account value of each client York recruited over a period of years. Specifically, York was told that he would receive a certain percentage of the account value in the first year the account resided with Scudder, and a lesser percentage for each of the following three years of the account. York understood that the sales incentive payments would be made quarterly and would only commence if and when a client actually transferred funds to Scudder. York also understood that sales incentive compensation would cease during a payout period if the client withdrew the funds from Scudder, as clients were entitled to do at any time.

Cassidy did not discuss with York the existence of any written Scudder policy that would govern his sales incentive compensation arrangement. Nevertheless, at the time of his discussion with Cassidy, there had been a written incentive compensation plan in existence for two years (the 1992 plan) that was substantially similar to the arrangement described to York by Cassidy. York acknowledges that he learned of the

1992 plan at some point and accepted that it governed his incentive compensation from 1994 through at least 1999. The 1992 plan did not provide that an employee would forfeit earned but unpaid incentive compensation if his employment was terminated during the payout period. The 1992 plan also did not require that sales representatives perform any further work with a particular client after the sale in order to receive incentive compensation.

In January, 1998, Scudder issued a new employee handbook that covered a broad array of topics and was published on Scudder's intranet. As part of its content on employment termination, the handbook stated: "In every separation, the formal employer-employee relationship ceases as of the separation date. The privileges and rights associated with employment end as of the separation date, including all forms of compensation, commissions, benefits, vacations, and leaves of absence." Scudder also issued other policies on various topics from time to time on its intranet. Although York never discussed the handbook and policies with anyone, he did know that they were available, and he recognized that he was subject to them, at least where they did not conflict with his oral negotiations with Cassidy.

On January 1, 1999, Scudder issued a new incentive compensation plan for sales representatives. Under this plan, sales representatives would only be paid the incentive compensation for three instead of four years, but additional assets would be included in calculating incentive compensation. In addition, Scudder issued a new incentive compensation plan for senior sales representatives, also effective as of January 1, 1999, that was substantially identical in relevant respects to the plan for sales representatives. (We refer to both plans collectively as the 1999 plan.) The 1999 plan stated the following: "Participants who terminate employment with [Scudder] for all other reasons (e.g., voluntary termination, involuntary termination with or without cause, etc.) prior to the payment of incentive awards, forfeit all rights to the payment of any and/or all awards under this Plan."

From 1994 to 1999, York secured a number of new accounts and was paid in accordance with the 1992 plan. In October,

1999, York was promoted to senior sales representative and given a new territory. York did not dispute that his sales incentive compensation was subject to the 1999 plan after January, 1999. By late spring of 2000, however, York was told that Scudder managers were cutting costs, including employee compensation costs, and that there would be layoffs. On August 28, 2000, York was informed that his employment was being terminated as of September 15, 2000, because his position was being eliminated in a sales group restructuring, and because Scudder did not believe that there were enough business opportunities to justify his position. Between October, 1999 (when he assumed his new position), and August, 2000, York did not bring any funds under management to Scudder. During his deposition, York admitted that he did not believe that Scudder's business decision was "improper" or that Scudder was not exercising "honest judgment" in terminating him. When Scudder terminated York, it also terminated thirty-five other employees, including three sales people, and it closed requisitions for fifty-nine open positions. After York was terminated, his former territory was divided between the Chicago representative and a more senior representative who previously shared the New England territory with York and whose territory geographically surrounded that of York.

During his deposition, York acknowledged that he had no basis to state that Scudder's reason for terminating him was to avoid paying him commissions after the date of his termination. Moreover, York did not contend that Scudder made false representations to him during his employment.

Scudder contends that York was paid all the salary and incentive compensation that he was due through the date of his termination. York was told that he would not be receiving any further incentive payments after his employment ended, although Scudder would pay him a severance package as provided in the 1998 employee handbook. In accordance with Scudder's separation policy applicable to involuntary terminations resulting from job restructuring, York received severance pay of $137,933.31, which included an enhanced severance benefit of $58,604.31.

Subsequently, York brought suit in Superior Court, claiming

that at the time of his termination, he was still owed incentive compensation of approximately $212,000 for sales made prior to 1999, and another $223,000 for sales made after January 1, 1999. York also claims that before he was terminated, he had received verbal commitments from four new clients that they would bring their assets to Scudder, and that he is owed incentive compensation for these clients as well.

*Discussion.* "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). In his deposition and by his failure to controvert in relevant respects Scudder's statement of undisputed facts, York has admitted facts that establish that he has no reasonable expectation of proving any of his claims or any right to recover postter-mination increments of incentive compensation.

York first contends that the judge erred in entering summary judgment on his breach of contract claim because she ignored a factual dispute whether his employment contract was defined by his oral agreement with Cassidy in 1994, at least with regard to when his incentive compensation discontinued, or whether it included the documents Scudder issued between 1992 and 1999, as Scudder claims. Under York's theory of the case, an oral employment contract was formed when he accepted the sales representative position on the terms offered by Cassidy, and any subsequent modification that conflicted with those terms did not apply to him unless he specifically agreed. However, York's employment contract was at-will, and as such Scudder could modify its terms or "terminate[] [the employment] at any time for any reason or for no reason at all," with limited exceptions, such as public policy considerations. *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 668 n.6 (1981). See, e.g., *Smith* v. *Graham Refrigeration Prod. Co.*, 333 Mass. 181, 186 (1955); *Kolodziej* v. *Smith*, 412 Mass. 215, 221-222 (1992). That being the case, even if York's original agreement in 1994 did not contain any provision discontinuing incentive compensation on termination, the documents Scudder issued in 1998 and 1999 modified the

terms of the incentive compensation program to include termination provisions. Moreover, York's deposition testimony and his responses to Scudder's statement of undisputed facts both evince York's awareness of Scudder's modifications and his general acceptance of them. York merely claims that he believed that the modifications did not apply to him to the extent that they differed from his conversation with Cassidy.[1] Since his was an at-will employment, York's belief was incorrect. York's breach of contract claim thus fails.

York also argues that Scudder breached an implied covenant of good faith and fair dealing by terminating his employment so that it would not be required to pay him his additional incentive compensation.[2] York relies largely on *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 660 (*Gram*), which permitted an at-will employee who was not terminated in bad faith to recover "identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his discharge without [good] cause." We think that York's *Gram* claim must fail because, at the very least, he has established no reasonable expectation of proving that his termination was without good cause. See *id.* at 666-672 (court discussed concept of good cause in context of terminating at-will employee).

Similar to *Gram*, in *Fortune* v. *National Cash Register Co.*,

---

[1] In a related argument, York also claims that the language of the termination clauses in the 1998 handbook and the 1999 plan is ambiguous, and does not necessarily convey that upon termination his incentive compensation will cease accruing. Considering the wording used in each document, which we have quoted above, we think that no "reasonably intelligent persons would differ" as to the conclusion about this language indicates that incentive compensation ends as of the date of termination. *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. 472, 474-475 (1987).

[2] The implied covenant of good faith and fair dealing "exists so that the objectives of the contract may be realized. . . . The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives. The scope of the covenant is only as broad as the contract that governs the particular relationship." *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 126 S. Ct. 397 (2005). This implied covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship." *Ibid.*, quoting from *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). See *Eigerman* v. *Putnam Invs., Inc.*, 66 Mass. App. Ct. 222, 226 (2006).

373 Mass. 96, 101 (1977), the Supreme Judicial Court, in the context of a bad faith termination, held that in certain limited circumstances, an at-will employment contract "contains an implied covenant of good faith and fair dealing." The court recognized the legitimate business interests of an employer in controlling its workforce and for wide discretion, often subjective, to adapt to changing environments. *Id.* at 101-102. At the same time, an injustice arises when an employer terminates an employee in such a way that it violates the covenant of good faith and fair dealing. See *id.* at 102; *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 660, 672.

There are several principles that emerge to guide our analysis of good faith and fair dealing in order to place the instant appeal in context. First, where an at-will employee has been terminated in bad faith, such as where an employer has acted to deprive an employee of a commission due, or about to be due, and to benefit financially at the employee's expense, the employee may recover compensation for work performed. *Fortune* v. *National Cash Register Co.*, *supra* at 104-105. Second, where an at-will employee is discharged without good cause, but the employer has not acted in bad faith, the employer is liable under the obligation of fair dealing "for the loss of compensation that is so clearly related to an employee's past service." *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. at 672. Third, bad faith is not established where there is no evidence that an employer was motivated by improper reason, even though an employee's termination may be " 'bad, unjust, and unkind' . . . , contrary to [his] reasonable expectations, and the product of inadequate investigation." *Id.* at 670, quoting from *Richey* v. *American Auto Assn.*, 380 Mass. 835, 839 (1980). See *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 126 S. Ct. 397 (2005) ("There is no general duty on the part of an employer to act 'nicely' "). The "absence of good cause itself or the mistaken belief that there is good cause [is not] conclusively demonstrative of bad faith." *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. at 670. "[T]ermination in the absence of good cause does not establish bad faith, and it is only a factor in determining whether there was fair dealing." *Id.* at 668. On the other hand,

"good cause to discharge an employee would tend to negate the existence of bad faith in the decision to discharge an employee." *Ibid.*

*Gram* does not explicitly define good cause, as it was clear in that case that Gram was fired without such cause. Elsewhere, Massachusetts courts have consistently defined good cause (occasionally referred to as "just" or "due" cause) as the existence of either "(1) a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of [its] business. Discharge for a '[good] cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith." *G & M Employment Serv., Inc.* v. *Commonwealth*, 358 Mass. 430, 435 (1970), appeal dismissed sub nom. *G & M Employment Serv., Inc.* v. *Department of Labor & Indus.*, 402 U.S. 968 (1971). See *Klein* v. *President & Fellows of Harvard College*, 25 Mass. App. Ct. 204, 208 (1987); *Goldhor* v. *Hampshire College*, 25 Mass. App. Ct. 716, 723 (1988). See also *Losacco* v. *F.D. Rich Constr. Co.*, 992 F.2d 382, 384-385 (1st Cir.), cert. denied, 510 U.S. 923 (1993); *Hammond* v. *T.J. Litle & Co.*, 82 F.3d 1166, 1176 (1st Cir. 1996). Honest judgment is assessed in the context of "the general principles that an employer is entitled to be motivated by and to serve its own legitimate business interests; that an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and that an employer needs flexibility in the face of changing circumstances. We recognize the employer's need for a large amount of control over its work force." *Fortune* v. *National Cash Register Co.*, 373 Mass. at 101-102. See *Siles* v. *Travenol Labs., Inc.*, 13 Mass. App. Ct. 354, 359 (1982).

It is uncontested that Scudder terminated York, along with thirty-five other employees, as part of a cost-cutting initiative. Further, York admits that he has no basis to say that Scudder's decision to terminate him was not reasonably related to Scudder's honest judgment of the needs of its business. Nonetheless,

York claims that by acknowledging that it laid him off as part of a cost-cutting initiative, Scudder essentially confessed to firing him so that it could keep his incentive compensation, and therefore, a material factual issue exists for the jury. Cost-cutting, however, is a legitimate business reason on which to base a termination for cause. See, e.g., *Karcz* v. *Luther Mfg. Co.*, 338 Mass. 313, 320 (1959) ("Discharges because of economic conditions on a nondiscriminatory basis must be regarded as for 'just cause' "); *Amoco Oil Co.* v. *Dickson*, 378 Mass. 44, 47-48 (1979) (collecting cases); *Losacco* v. *F.D. Rich Constr. Co.*, supra at 385 ("Appellant has directed us to, and we have found, no cases involving just cause which prohibit economically-motivated terminations"). Indeed, *Fortune* v. *National Cash Register Co.*, 373 Mass. at 102, recognized the legitimacy of an employer's business reasons for terminating employees. Scudder's nondiscriminatory discharge of York, for cost-cutting reasons, falls within the definition of good cause. No doubt that whether a termination was for good cause commonly presents a fact question for the jury, see *Goldhor* v. *Hampshire College*, supra at 722; however, on this record, there would be no room for a jury to infer that York's termination was not for grounds "reasonably related, in the employer's honest judgment, to the needs of [its] business." *G & M Employment Serv., Inc.* v. *Commonwealth*, supra at 435. Contrast *Maddaloni* v. *Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 882 (1982) (allowing recovery under *Fortune* and *Gram* where evidence permitted an inference that termination was not for the legitimate business reasons posited by the employer). Despite his claim, York, during his deposition, admitted that he has no basis to contend that Scudder terminated him for the purpose of depriving him of sales incentive compensation.[3] Because there is no basis for a jury to infer that he was not fired for good

---

[3]Scudder also offered the uncontested deposition testimony of a witness called pursuant to Mass.R.Civ.P. 30(b)(6), 365 Mass. 782-788 (1974), that York was eliminated in an organizational restructuring because his territory was encircled by the territory of a more senior sales representative, who Scudder believed could absorb York's territory.

During this litigation, it has appeared that York categorized the accounts in issue into two groups. One involved lost incentive compensation that would have been due to York based on client accounts established before his termina-

cause, York has no reasonable expectation of successfully proving his claim under *Gram*, and summary judgment was properly allowed.[4]

Next, the judge properly granted summary judgment on York's claim of misrepresentation. York states that he worked diligently to acquire clients, relying on Cassidy's representation that he would receive incentive compensation for those clients. York, however, testified at his deposition that Scudder did not make false representations to him during his employment.[5] Additionally, in his response to Scudder's statement of undisputed facts, York "admit[ted] that he is unaware of particular statements made by Scudder or Zurich Scudder employees that such employees knew were false at the time they made them." Bound by these admissions, York had no reasonable expectation of proving his misrepresentation claim.

Finally, York's quantum meruit claim was properly rejected.

tion in 2000. The other concerned potential incentive compensation for the accounts of four prospective clients that gave York verbal assurances before his termination, but did not transfer funds to Scudder and establish accounts until after his termination. Scudder has stated that the latter prospective claim is "*Fortune*-like." We note, for the reasons stated above, that York's claim for potential incentive compensation is unpersuasive here.

[4] Scudder claims that its incentive compensation structure reflected an ongoing obligation and relationship with respect to client funds, such that increments were earned only as the employee continued working. Scudder further notes that the fact and amount of future incentive compensation increments were subject to a number of unforeseeable contingencies, including a client's freedom to withdraw his funds at any time, and that the governing documents (the 1998 handbook and the 1999 plan) provided that payments of incentive compensation would cease on termination. Accordingly, quite apart from the good cause basis for its termination decision, Scudder contends that York has no expectation of producing evidence sufficient to demonstrate several of the other elements necessary for a *Gram* claim, including whether he earned the incentive compensation based upon past services, whether the amount of the allegedly deprived incentive pay was reasonably ascertainable, and whether York could have reasonably anticipated the incentive compensation based upon the terms of his contract. See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. at 671-672. See also *Gram* v. *Liberty Mut. Ins. Co.*, 391 Mass. 333, 336 (1984) (*Gram II*) ("Future policy changes and future premium levels are speculative" and do not provide basis for recovery). In light of the good cause determination, we need not address these other bases.

[5] Q.: "Do you contend that Scudder made false representations to you during your employment at the company?"

YORK: "I do not contend that, no."

Both York and Scudder agree that a contract in some form governed York's employment. Questions only arise as to the terms of the contract. It is well settled that quantum meruit relief may not be granted where an express contract covering the matter exists. See *Zarum* v. *Brass Mill Materials Corp.*, 334 Mass. 81, 85 (1956); *Boswell* v. *Zephyr Lines, Inc.*, 414 Mass. 241, 250 (1993).

*Conclusion.* For the reasons stated above, the judge properly allowed summary judgment in favor of Scudder on all counts.

*Judgment affirmed.*