Wilkins, Douglas H., J.
In this employment action, the plaintiff, pro se, alleges that his former employer, Dr. Dario C. Altieri (“Dr. Altieri”) of the Universiiy of Massachusetts Medical School (“UMMS”), unlawfully terminated him and discriminated against him on the basis of his national origin (Greek, Southern European, or Mediterranean). The plaintiff has asserted counts against UMMS for breach of contract (Count I), wrongful discharge in breach of contract (Count II), and breach of the implied covenant of good faith and fair dealing (Count III), and he brought against both defendants a count for retaliation in violation of G.L.c. 15 IB, §4(4) (Count IV). The plaintiff also asserted against Dr. Altieri counts for tortious interference with contractual rights (Count V); tortious interference with advantageous business or economic relations (Count VI); promissory estoppel (Count VII); intentional infliction of emotional distress (Count VIII); and prior restraint on publication (Count IX).
On June 25, 2010, the Court (Lu, J.) dismissed Count IV as to UMMS only, as well as Counts VIII and IX [27 Mass. L. Rptr. 272]. The matter is now before the Court on the defendants’ Motion for Summaiy Judgment on the remaining counts. For the following reasons, the motion is ALLOWED.
BACKGROUND
The bulk of the parties’ 171-page Consolidated Statement of Undisputed Facts (“SOF”) does not comport with Superior Court Rule 9A(b){5), owing primarily to the defendants’ inclusion of many immaterial and argumentative facts evidently designed to place themselves in a favorable light and the plaintiffs habit of venturing outside the record to impugn Dr. Altieri’s personal and professional integrity whenever possible. Rather than proceed paragraph by paragraph to determine which statements should be stricken for noncompliance with the rule,[2] the Court briefly summarizes the more relevant facts and, where they are disputed, views them in the light most favorable to the plaintiff. See Attorney Gen. v. Bailey, 386 Mass. 367, 371 (1982).
The plaintiff has a Ph.D. in biochemistry. After spending a few years researching the molecular biology of plants at a laboratory in San Diego, California, the plaintiff spent two years in Spain, during which time he did not work in a laboratory. In 2001, he moved to Tampa, Florida, where he worked as a post-doctoral associate with the Moffitt Cancer Center at the University of South Florida. This position involved working with the survivin gene, a molecule linked to cancer in humans, which had recently been discovered in Dr. Altieri’s laboratory at UMMS.
On August 25, 2004, Dr. Altieri offered the plaintiff a position as a post-doctoral associate in his laboratory at UMMS. The offer stated that the plaintiffs entry-level salary was to be $42,000 per year, that he would be offered a benefit package and coverage consistent with UMMS guidelines, and that he would be expected to commit to working in the laboratory for no less than two years.
The plaintiff accepted the offer and began working for Dr. Altieri on September 15, 2004. The parties did not specify a duration for the plaintiffs employment. Rather, the plaintiff understood that “if I perform[ed] well, I could be there without limit.” Ex. B., PI. Depo., p. 32,11. 19-20. According to the UMMS Postdoctoral Policy (“the Policy”), which was in effect from April 2003 until at least 2008, “[i]t is anticipated that a Postdoctoral training position will generally not be longer than five (5) years at this institution.” Ex. B., PI. Depo., Attachment 4, p. 2. The plaintiff read this document when he began work. The Policy also provides that “[t]he initial appointment will usually be for a one year period, but may be made for less than one year upon mutual agreement” and that “[n] on-renewal of appointment should be provided in writing by the PI three (3) months before termination.”
On August 31, 2004, Dr. Altieri sent a letter to U.S. Citizen and Immigration Services in support of the plaintiffs application for an H-1B visa. In this letter, Dr. Altieri indicated that the plaintiffs position would be for the period from September 15, 2004, to September 14, 2007.
During his tenure in Dr. Altieri’s laboratory, the plaintiff received one salary increase, which he got in 2006 after approaching Dr. Altieri about a raise. According to the Policy, “[postdoctoral personnel are not eligible for any proposed UMMS across-the-board, salary, or merit increases.” Id. at Attachment 4, p. 5. However, “[s]alaries for post[]doctoral personnel are usually increased on the hiring date anniversary, according to Institutional policy.” Id.
The Policy also provided for suspension and possible termination where post-doctoral personnel posed “a threat to safety or a clear impediment to the work of a research lab or other organizational unit.” Id. at Attachment 4, p. 4. It was silent with respect to whether post-doctoral personnel served “at will” or were otherwise subject to termination without cause, but did state that “ [a]ll appointments at the University [of] Massachusetts Medical School are contingent upon the availability of funds.” Id. at Attachment 4, p. 3.
*178 The plaintiffs primary responsibility in Dr. Altieri’s laboratoiy was to study the survivin gene’s role in the division of cancer cells. Throughout 2005 and 2006, Dr. Altieri and the plaintiff did not see eye-to-eye regarding the plaintiffs progress on his assigned sur-vivin project. Meanwhile, Dr. Altieri assigned the plaintiff to work with researchers on other projects related to survivin. In 2006 and 2008, the plaintiffs efforts on those other projects culminated in his co-authorship of two articles that were peer-reviewed and published in reputable scientific journals.
In March 2007, Dr. Altieri produced a revised draft of a research paper titled “Regulation of Cdkl Activity by Survivin,” which was based on the plaintiffs work on his assigned survivin project. Dr. Altieri edited the text and left out certain experimental results that the plaintiff had achieved which, in Dr. Altieri’s opinion, could not be explained. After completing the draft, Dr. Altieri told the plaintiff that he believed the paper was suitable for publication in a number of respectable, but lower-caliber scientific journals. The plaintiff, however, wanted to aim higher. Ultimately, Dr. Altieri agreed to submit the paper to “Nature Cell Biology,” but cautioned the plaintiff that the paper was not as sophisticated as those typically selected for publication in such a high-level journal.
Nature Cell Biology rejected the paper, but the editor noted that she might consider a revised version that included additional experiments and information. After making some changes to the paper, Dr. Altieri submitted it to “EMBO Reports” on March 30, 2007. After circulating the paper for outside peer review, EMBO Reports rejected it for publication, calling into question the findings and citing the need for additional experimentation. The journal’s editor stated that she would be willing to consider a new submission addressing the reviewers’ concerns. Dr. Altieri sent to the editor an appeal letter reinforcing the novelty of the experimental results and requesting reconsideration of the initial decision not to publish. The editor rejected the appeal, adding that, in light of new disclosures in Dr. Altieri’s appeal letter regarding survivin’s indirect role in Cdkl activation, resubmitting the paper would likely be unproductive.
After this latest disappointment, Dr. Altieri asked the plaintiff to reproduce his experimental results indicating that survivin increases Cdkl activity. As of May 13, 2007, the plaintiff had been unable to do so. In fact, Dr. Altieri expressed concern that the latest round of experiments actually contradicted the paper’s hypothesis. He indicated that he was not comfortable submitting the paper in its current form to a third scientific journal.
Amid these unsuccessful attempts to publish the plaintiffs research, Dr. Altieri wrote a letter in support of the plaintiffs application to extend his H-1B visa, which was set to expire in September 2007 and, by its terms, could be extended only through January 7, 2010. Dr. Altieri’s letter indicated that the plaintiffs employment period would be September 15, 2007, to January 7, 2010.
In February 2008, Dr. Altieri learned that one of his federal research grants would not be renewed, and that the earliest date for peer review of a revised application for funding would be in October 2008. The loss of this grant left Dr. Altieri with a budget shortfall of approximately $200,000 per year.[3]
On March 7, 2008, Dr. Altieri notified the plaintiff that his position as a post-doctoral associate in Dr. Altieri’s laboratoiy at UMMS would be eliminated “due to a deficiency in research funds,” and that the action was “not related to [his] performance.” Ex. B., PI. Depo., Attachment 34. On May 2,2008, Dr. Altieri sent a follow-up letter notifying the plaintiff that his effective termination date would be August 15, 2008, to allow time for the plaintiff to prepare the latest draft of his research paper for publication. Dr. Altieri sent inquiries to UMMS colleagues about post-doctoral positions for the plaintiff, but nothing came of them.
In July 2008, Dr. Altieri submitted a substantially revised version of the plaintiffs research paper, “Regulation of Cdkl Activity by Survivin,” to Nature Cell Biology for publication. Nature Cell Biology sent the draft to outside referees for review. On August 11, 2008, Dr. Altieri told the plaintiff by e-mail that “I am committed at [sic] having your paper published in the best possible journal.” Compl., Ex. N.
On August 13, 2008, the plaintiff filed an internal complaint with UMMS’s Diversity and Equal Opportunity Office (“DEOO”), alleging unfair and discriminatory treatment, bullying, bias, and unethical behavior. Compl. Ex. O. On September 16, 2008, the plaintiff attempted to file a complaint with the Massachusetts Commission Against Discrimination (“MCAD”), which has since taken the position that the plaintiff never timely filed a complaint. See Worcester Civil Action No. 2011-00984.[4] After an investigation, UMMS dismissed the DEOO complaint and subsequently denied the plaintiffs appeal.
The plaintiff testified at his deposition that Dr. Altieri had “maliciously” prevented him from publishing his work, but when asked whether any part of that maliciousness was based on the plaintiffs Spanish national origin, his race, or his age, the plaintiff responded: “No. It’s scientific, purely scientific. He [Dr. Altieri] cannot tolerate that somebody may know something about a particular aspect of science more than him. It’s his ego.” Ex. B., PI. Depo., pp. 91-92.
In late-August 2008, Minakshi Guha (“Guha”), a Ph.D. researcher in Dr. Altieri’s laboratoiy, told Dr. Altieri and Marlene Tucker (“Tucker”), Director of UMMS’s DEOO, that the plain tiff was veiy angiy about his termination and that he had threatened to harm Dr. Altieri. The plaintiff denies the truth of Guha’s allegations, but he does not dispute that she made them. On September 12, 2008, Dr. Altieri saw the *179 plaintiff in the main hallway of UMass Memorial Hospital and notified Tucker that he felt threatened by the plaintiffs continued presence on campus. He wrote a similar e-mail to UMMS’s Dean. On September 16, 2008, UMMS’s Police Department issued a no-trespass order to the plaintiff.
On September 10, 2008, Nature Cell Biology notified Dr. Altieri that the latest draft of “Regulation of Cdkl Activity by Survivin’’ had been rejected. On September 15, 2008, Dr. Altieri sent plaintiff a letter advising him of the rejection and stating that he no longer wished to be associated with the plaintiffs work. Dr. Altieri added that the plaintiff was free to publish the paper independently, without using Dr. Altieri’s name. The plaintiff did not receive a copy of this letter until July 9, 2009, and did not know that his paper had been rejected.
Meanwhile, aware that the filing of a DEOO complaint against Dr. Altieri diminished the likelihood that Dr. Altieri would provide a favorable recommendation to potential employers, the plaintiff wrote to his UMMS colleagues and UMMS’s Chancellor for assistance. After receiving no help from them, he wrote directly to Dr. Altieri on February 20, 2009. When he did not receive a response, he tried once more to get the Chancellor and Dr. Altieri to assist him in publishing his research and to provide him with a reference letter.
Although the plaintiffs e-mails after September 15, 2008, made plain that he had not received Dr. Altieri’s letter, Dr. Altieri did not respond.
On October 2, 2009, the plaintiff filed this action against UMMS and Dr. Altieri. On October 28, 2009, in response to the plaintiffs request during the course of litigation, Dr. Altieri wrote a reference letter on the plaintiffs behalf, addressed “To Whom It May Concern.” The letter cited a funding shortfall as the only basis for Dr. Altieri’s decision to abandon the plaintiffs research and it painted the plaintiff in a positive light. Nevertheless, the plaintiff was unable to secure new employment.
On September 22, 2010, the plaintiffs paper was accepted for publication in the Journal of Biological Chemistry (“JBC”). On December 23, 2010, JBC withdrew its acceptance after learning that the paper’s co-authors, Dr. Altieri and Dr. Fang Xia, had not consented to having their names attached to the research. The plaintiff immediately contacted Dr. Altieri’s attorney, Jean Kelley (“Attorney Kelley”), and asked her to resolve the matter. Attorney Kelley responded that it was unlikely that Dr. Altieri would consider lending his name to the paper while he was the target of the plaintiffs lawsuit.
DISCUSSION
I. Standard of Review
Summaiy judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. Pederson v. Time, Inc. 404 Mass. 14, 16-17 (1989). A party moving for summaiy judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis, 410 Mass. at 716. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact.” Pederson, 404 Mass. at 17. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). The court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Bailey, 386 Mass. at 370-71.
II. Analysis
1. Counts I and II (Breach of Contract and Wrongful Discharge — Against UMMS)
The defendants argue that they are entitled to summaiy judgment on Counts I and II because the plaintiff was an at-will employee subject to termination at any time without cause. “As a general rule, where an employment contract, be it express or implied, contains no definite period of employment, it establishes employment at will.” Jackson v. Action for Boston Cmty. Dev., Inc., 403 Mass. 8, 9 (1988). Where the contract is ambiguous with respect to the duration of the employment, whether the employment is at-will or for a definite term is determined by reference “not only to the contract language but also to the attendant circumstances, including ‘the nature of the employment . . . the prior negotiation, [and] the situation of the parties.’ ” Kravetz v. Merchants Distribs., Inc., 387 Mass. 457, 460 (1982), quoting Mahoney v. Hildreth & Rogers Co., 332 Mass. 496, 498 (1955).
In Mahoney, the Supreme Judicial Court concluded that the employer’s offer of a salary payable at an annual rate supported a finding “that the parties intended the employment of the plaintiff to continue for at least a year.” 332 Mass. at 499. Moreover, “from the continuance of service by the plaintiff it could further be found that there was an implied renewal of the contract from year to year.” Id Under those circumstances, the Court concluded that the employer could not terminate the plaintiff without “justifiable cause.” Id.
Here, based on the terms of Dr. Altieri’s offer letter, the plaintiff committed to work for no less than 2 years from September 15, 2004, and a fact-finder could find *180 that UMMS was bound to a similar two-year period in the absence of a funding loss or other cause. He has a viable claim that the parties intended his employment to continue for at least two years.[5] The plaintiff, however, received the benefit of that bargain as his termination occurred in March 2008, effective August 15, 2008. In addition, the plaintiff received more than 3 months notice of his termination (or “non-renewal”— a term which the Policy seems to use interchangeably with “termination”) for lack of funds pursuant to the Policy. After that time, the only reasonable conclusion from the evidence is that the plaintiff was (and perhaps had long been) an at-will employee.
Even if the Court assumes for the sake of argument that the plaintiff had an implied year-to-year contract that required justifiable cause for termination before September 14, which is the natural end date for each year of employment, the plaintiff does not dispute that Dr. Altieri lost considerable funding prior to the plaintiffs termination and that the two had scientific disagreements that hindered their working relationship.
The requirement of just cause to terminate a year-to-year employment relationship is not so rigid that the employer is required to rearrange its financial affairs to spare each employee’s job. The Supreme Judicial Court has stated that “(t]he standard of ‘just cause,’ ... in the context of a statute regulating employment agencies, would require determination (among other matters) whether there existed (1) a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer’s honest judgment, to the needs of his business.” Boothby v. Texon, Inc., 414 Mass. 468, 480-81 (1993), quoting G&M Emp’t Serv., Inc., 358 Mass. 430, 435 (1970).
The defendants’ “[h]onest judgment is assessed in the context of ‘the general principles that an employer is entitled to be motivated by and to serve its own legitimate business interests; that an employer must have wide latitude in deciding whom it will employ in the face of the uncertainties of the business world; and that an employer needs flexibility in the face of changing circumstances.’ ” York v. Zurich Scudder Invs., Inc., 66 Mass.App.Ct. 610, 617 (2006), quoting Fortune v. National Cash Register Co., 373 Mass. 96, 101-02 (1977).
The 2004 offer letter, construed in light of the Policy, was contingent upon funding. The plaintiffs own belief that the loss of grant money in 2008 left Dr. Altieri’s laboratory underfunded does not suffice to create a genuine issue of material fact on this point, nor do his reminders that Dr. Altieri continued to draw a hefty salary after making cutbacks. See LaLonde, 405 Mass. at 209. The fact that grant money was ultimately restored and new hires were made after the plaintiff was terminated does not negate the budget problems that existed at the time of the decision. Furthermore, for reasons discussed more fully below, the evidence in the summary judgment record does not support a claim of unlawful discrimination.
The defendants have provided good-faith grounds for the plaintiffs discharge that were reasonably related to the economic challenges facing the laboratory, and the plaintiff has no reasonable expectation at trial of controverting that evidence with evidence that the defendants did not have just cause. See Karcz v. Luther Mfg. Co., 338 Mass. 313, 320 (1959) (“Discharges because of economic conditions on a nondiscriminatory basis must be regarded as for ‘just cause’ ”). Accordingly, UMMS is entitled to summary judgment on Counts I and II.
2. Count III (Breach of Implied Covenant of Good Faith & Fair Dealing — Against UMMS
As discussed above, there is no evidence that UMMS’s termination decision was in bad faith or was otherwise motivated by anything other than its legitimate business interests. Accordingly, the plaintiff has no reasonable expectation of establishing that his termination breached the implied covenant of good faith and fair dealing. See Fortune, 373 Mass. at 104.
The plaintiff also alleges that UMMS breached the implied covenant of good faith and fair dealing through Dr. Altieri’s failure to (1) revise the plaintiffs salary annually, (2) provide the plaintiff with money to attend scientific conferences, and (3) use his best efforts in publishing the plaintiffs research.
The implied covenant ensures that parties “remain faithful to the intended and agreed expectations of the contract,” Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004), and “[a] breach occurs when one party violates the reasonable expectations of the other” (emphasis supplied). Chokel v. Genzyme, 449 Mass. 272, 276 (2007). “The covenant does not supply terms that the parties were free to negotiate, but did not, nor does it create rights and duties not otherwise provided for in the contract” (internal quotations and citations omitted). See id.
The record does not support a reasonable expectation that the plaintiff would receive annual salary increases or that he was entitled to money to attend conferences. While Dr. Altieri’s use of the terms “entry-level salary” or “initial salary” might imply some opportunity for raises in the future, it does not by itself create an entitlement to a raise, nor does it invite the inference that such raises would be annual. The Policy’s statement that “(s]alaries for post doctoral personnel are usually increased on the hiring date anniversary” (emphasis supplied), see Ex. B, Attachment 4, p. 5,.merely establishes a non-binding guidepost. The qualifying adverb “usually,” taken in context with the preceding sentence stating that “(p)ostdocto-ral personnel are not eligible for any proposed UMMS *181 across-the-board, salary or merit increases,” highlights the discretionary nature of salary increases and extinguishes any reasonable expectation that annual raises were a term of employment.
With respect to the conferences, the record establishes that post-doctoral personnel were permitted to attend scientific conferences at Dr. Altieri’s discretion and subject to sufficient grant funding. The fact that National Institute of Health research grants provide that travel expenses for post-doctoral personnel are “allowable” does not transform such expenses into a contractual right. Evidence that one other post-doctoral researcher attended a conference in Vancouver on one occasion does not establish a binding institutional agreement to send researchers to conferences as a condition of employment.
Finally, there is no support for the plaintiffs allegation that Dr. Altieri sabotaged the plaintiffs hopes of publication in a quality journal by intentionally writing a bad manuscript. There is no evidence to suggest that, in the context of their employment relationship, Dr. Altieri’s pledge to assist the plaintiff with publication required anything beyond a year-and-a-half of revisions and submission to journals on three separate occasions. See Chokel, 449 Mass. at 276 (implied covenant protects only reasonable expectations).
3. Count IV (Retaliation in Violation of G.L.c. 15 IB, §4(4) — Against Dr. Altieri)
The plaintiff bases his claim for retaliation under G.L.c. 151B, §4(4), on events set in motion by the filing of his DEOO complaint. Cf. Ritchie v. Department of State Police, 60 Mass.App.Ct. 655, 664-65 (2004) (“ ‘[C]omplaining to management or filing an internal complaint of harassment,’ or ‘meeting with co-workers to discuss how to stop sexual harassment in the workplace,’ can trigger the protections of c. 151B”), quoting MCAD Sexual Harassment in the Workplace Guidelines IX(A). He alleges that Dr. Altieri retaliated against him by: (1) seeking a no-trespass order against the plaintiff in September 2008; and (2) refusing to help the plaintiff publish the scientific research article that he had written under Dr. Altieri’s supervision.[6]
I do not agree with the defendants’ argument that the plaintiffs DEOO complaint did not allege unlawful discrimination and, therefore, was not legally protected conduct within the meaning of the statute. See G.L.c. 151B, §4(4); Ritchie, 60 Mass.App.Ct. at 664. While the DEOO complaint is certainly not a model of clarity or specificity, it broadly alleges that Dr. Altieri discriminated against the plaintiff in the terms, conditions or privileges of his employment on the basis of national origin. See G.L.c. 15 IB, §4(1). Therefore, the Court turns to the substance of the claim.
To succeed on his retaliation claim, the plaintiff need not prove that Dr. Altieri actually discriminated against him, but he must “prove that he reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination.” Ritchie, 60 Mass.App.Ct. at 664, quoting Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 121 (2000). In light of the plaintiffs own testimony that Dr. Altieri’s “malicious” treatment of the plaintiff was “purely scientific,” and not based on his nationality, race, or age, the Court concludes that no rational juror could find that the plaintiff harbored a reasonable, good-faith belief that Dr. Altieri had engaged in unlawful discrimination. See id. Notably, there is no other evidence in the summary judgment record, direct or circumstantial, to suggest that Dr. Altieri’s stated reason for terminating the plaintiff — insufficient funding — was merely a pretext to mask discriminatory animus against Spanish nationals. See Abramian, 432 Mass. at 116-18.[7]
4. Counts V and VI (Tortious Interference with Contractual Rights and Advantageous Business/Economic Relations — Against Dr. Altieri)
With respect to the plaintiffs claim for intentional interference with contractual rights and prospective advantageous business/economic relations, he must show that Dr. Altieri acted with “actual malice” — that is, a “spiteful, malignant purpose,” unrelated to some legitimate interest — in inducing UMMS to break its employment relationship with the plaintiff and in failing to try harder to publish the plaintiffs paper. See Blackstone v. Cashman, 448 Mass. 255, 260-61 (2007); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815 (1990). See also Weber v. Community Teamwork, Inc., 434 Mass. 761, 782 (2001) (conclusion that supervisor unlawfully discriminated against plaintiff “might, but does not necessarily, support an inference of actual malice”).[8]
Although unlawful discrimination might constitute a spiteful, malignant purpose, the evidence in the summary judgment record does not support a prima facie claim of unlawful discrimination. Therefore, the plaintiff must offer some other evidence to support his allegations of malice. To that end, the plaintiff has testified that Dr. Altieri was not sufficiently nurturing, was overly critical of the plaintiffs work, and was otherwise arrogant and disrespectful, in part because some of the plaintiffs ideas conflicted with Dr. Altieri’s.
As a matter of law, mere professional disagreements do not meet the malice requirement in the employment context. Neither “the motivation of personal gain, including financial gain,” nor “personal dislike,” is sufficient to “warrant an inference of the requisite ill will.” King v. Driscoll, 418 Mass. 576, 587 (1994). See also Martin-Kirkland v. United Parcel Serv., Inc., 71 Mass.App.Ct. 1123, 2008 WL 1944223 at *4 (May 6, 2008) (Memorandum of Decision and Order Pursuant to Rule 1:28) (summary judgment properly awarded on issue of defendant’s malice where plaintiff testified *182 that defendant “was trying to advance his career, and that he viewed her as an obstacle to his success”).
That Dr. Altieri might have felt threatened by the plaintiffs accomplishments, without more, also does not establish the requisite ill will to support a claim of interference with contractual or business relations. See Portnoy v. 440 Fin. Group of Worcester, Inc., 938 F.Sup. 91, 94-95 (D.Mass. 1996) (summary judgment proper where plaintiff failed to show that defendant’s irritation, resentment, and “self-interest in job security,” manifested themselves “in the form of spite, ill will or malignant, illegitimate purpose”).
Furthermore, where there is no direct evidence of malice, any inference that spite or ill will was the controlling factor in urging the plaintiffs discharge must be based on probabilities rather than mere possibilities. Gram, 384 Mass. at 664. There is no dispute that Dr. Altieri faced a temporary budget shortfall, and the plaintiff has not offered competent evidence to show that his selection for termination and Dr. Altieri’s subsequent abandonment of the research paper were probably the result of a spiteful, malignant purpose unrelated to the legitimate operation of the laboratory. See Blackstone, 448 Mass. at 260-61. Accordingly, Counts V and VI shall be dismissed for failure to establish a genuine issue of material fact as to whether Dr. Altieri acted with actual malice. See id.
5. Count VII (Promissory Estoppel— Against Dr. Altieri)
The plaintiffs promissory estoppel claim is based on Dr. Altieri’s representation that he was committed to publishing the plaintiffs work.
To succeed on a claim for promissory estoppel, the plaintiff must show: (1) that Dr. Altieri made a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the plaintiff, (2) that the promise did induce such action or forbearance, and (3) that injustice can be avoided only by enforcement of the promise. See Loranger Constr. Co. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 154 (1978). Put another way, promissory estoppel requires “that there be an unambiguous promise and that the party to whom the promise was made reasonably relied on the representation.” Rhode Island Hosp. Trust Nat’l Bank v. Varadian, 419 Mass. 841, 848 (1995).
Given the multiple layers of approval required to secure publication in a scientific journal, Dr. Altieri’s assurance that he was committed to publishing the work could not reasonably be understood as an unambiguous promise that the work would in fact be published. The record shows that Dr. Altieri had considerable incentive to publish the plaintiffs research and that he expended significant effort toward achieving that goal. To the extent that Dr. Altieri’s commitment to working with the plaintiff wavered after the plaintiff initiated formal complaints against him, there-is no injustice that requires relief. See Loranger, 6 Mass.App.Ct. at 154.
ORDER
For the foregoing reasons, the defendants’ Motion for Summary Judgment is ALLOWED on all counts.

The Court gave serious consideration to striking the parties’ filings altogether for non-compliance with the letter and spirit of Rule 9A(b)(5). In a similar situation in the future, it may well do so.

Dr. Altieri’s grant funding was eventually restored, but not until March 2, 2009, by which time the plaintiff had already been terminated. Ex. AE. Dr. Takehiko Dohi testified that Dr. Altieri hired two new employees in early 2009.

The Court in no way endorses this position and addresses the plaintiffs discrimination claim on the merits. For purposes of this motion, I assume, without deciding, that the circumstances justify equitable tolling. See Memorandum of Decision and Order dated November 22, 2011 (Paper No. 6), in Worcester Civil Action No. 2011-00984.

No view of the facts permits an inference that the employment dates on the plaintiffs H-1B visa applications constituted a promise of continued employment. See Arboireau v. Adidas-Salmon AG, 347 F.3d 1158, 1166 (9th Cir. 2003) (immigrant visa application stating term of employment was three years was “to avoid annual paperwork” and did “not imply a reciprocal commitment of [the employers] to a three-year term-employment contract”). Nor did the provision in the UMMS Policy suggesting that the lifespan of post-doctoral positions not exceed five years constitute a promise of employment for at least that duration.

Post-termination action may qualify as an “adverse employment action” for purposes of a G.L.c. 15 IB retaliation claim. See Psy-Ed Corp. v. Klein, 459 Mass. 697, 712-13 (2011). However, it is highly questionable whether the phrase “adverse employment action” includes an employer’s post-termination decision not to attach his name to a scientific article. See King v. Boston, 71 Mass.App.Ct. 460, 468 (2008) (“Cases have employed the phrase ‘adverse employment action’ to refer to the effects on working terms, conditions, or privileges that are material, and thus governed by the statute, as opposed to those effects that are trivial and so not properly the subject of a discrimination action”).
For purposes of this motion, the Court assumes, without deciding, that Dr. Altieri’s alleged refusal to assist in publishing the plaintiffs work post-termination constitutes an adverse employment action.

To the extent that the plaintiff asserts that Dr. Altieri discriminated generally against all foreign post-doctoral associates, the plaintiffs allegation is at odds with his own characterization of the favorable treatment that other non-American associates in the laboratory received. Furthermore, he conceded that Dr. Altieri did not have a single American researcher on his staff to whom a relevant comparison could be made. Ex. C, PI. Depo., pp. 115-16. See Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129-30 (1997).

The fact that the employment relationship was at-will does not necessarily defeat the plaintiffs claim that Dr. Altieri improperly interfered with his contractual relations. See Harrison v. NetCentric Corp., 433 Mass. 465, 477 (2001) (‘The nature of an at-will employment contract does not, by itself, preclude a finding that a relationship exists with which there can be tortious interference”); Restatement (Second) of Torts §766, cmt. g., at 10-11 (1979) (agreement at will is “valid and subsisting,” until terminated, and “defendant may not improperly interfere with it”).