MANUEL J. CACHOPA *vs.* TOWN OF STOUGHTON & others.[1]

No. 07-P-1247.

Norfolk. May 15, 2008. - September 15, 2008.

Present: PERRETTA, DUFFLY, & GRAINGER, JJ.

*Contract,* Interference with contractual relations. *Malice. Damages,* Unlawful interference, Emotional distress. *Emotional Distress. Massachusetts Tort Claims Act. Civil Rights,* Immunity of public official.

In a civil action brought by a police chief (plaintiff) against certain members of a town's board of selectmen, alleging intentional interference with the contractual relationship between the plaintiff and the town, there was no evidence that the selectmen controlled the operation of the town to the degree that they could be viewed as its alter ego and, thus, incapable of interfering as a third party with the town's contractual relationship with the plaintiff. [660-661]

In a civil action brought by a police chief (plaintiff) against certain members of a town's board of selectmen (defendants), alleging intentional interference with the contractual relationship between the plaintiff and the town, the judge erred in granting summary judgment in favor of the defendants, where the plaintiff met his burden of demonstrating that the defendants knowingly interfered with his employment contract [661] with improper motives [661-663], and where the plaintiff's receipt of a settlement from the town did not discharge, with regard to the defendants, the damages arising from the economic harm and emotional distress that the plaintiff suffered [663-665].

In a civil action brought by a police chief (plaintiff) against certain members of a town's board of selectmen (defendants), alleging intentional interference with the contractual relationship between the plaintiff and the town, the defendants failed to demonstrate that the plaintiff's claims against them were barred by the Massachusetts Tort Claims Act, G. L. c. 258, § 10(*c*) [665]; by the qualified immunity standard applicable to civil rights actions [665]; or by the absolute immunity conferred by the speech and debate clauses of the Federal and State Constitutions [665-666].

CIVIL ACTION commenced in the Superior Court Department on August 5, 2004.

The case was heard by *Barbara A. Dortch-Okara*, J., on motions for summary judgment.

[1]Gerald Goulston and Joseph Pascarelli.

*Kevin G. Powers* for the plaintiff.

*Adam Simms* for Gerald Goulston.

*Jeffrey M. Sankey* for Joseph Pascarelli.

GRAINGER, J. The plaintiff, Manuel Cachopa, appeals from the grant of summary judgment dismissing his claims against the defendants, Gerald Goulston and Joseph Pascarelli.[2] We are asked to decide whether acts committed during an extended period of political feuding among public officials in the town of Stoughton (town) can arguably sustain a cause of action for intentional interference with an "advantageous contractual relationship."[3] We reverse the judgment of dismissal.

*Background.* "We recite the material facts in the light most favorable to [the plaintiff], as the nonmoving party." *Lyons* v. *Nutt,* 436 Mass. 244, 245 (2002). Cachopa, hired as a patrol officer with the Stoughton police department (department) in 1985, was promoted through the ranks to detective, sergeant, and then lieutenant. He became acting chief in 1999 and, in February, 2001, was appointed chief of police. As a lieutenant, Cachopa conducted a "sting" operation resulting in a fine against defendant Goulston's store for selling liquor to minors. In 2000, under Cachopa's direction as acting chief, the department again conducted sting operations against the town's liquor stores, and Goulston's store was again caught selling liquor to minors. Soon after the 2000 sting, Goulston ran unsuccessfully for a position on the town board of selectmen (board). One of the issues in the election was the sale of alcohol to minors by Goulston's store. Goulston ran again in 2002 for the board and this time was elected.

---

[2]Cachopa settled his claim against the town of Stoughton, and it is not a party to this appeal.

[3]Cachopa's complaint describes his claim as one for interference with an "advantageous contractual relationship," semantically melding two similar torts. See *Cavicchi* v. *Koski,* 67 Mass. App. Ct. 654, 657 (2006) (noting substantial similarities between interference with a contractual relationship and interference with an advantageous business relationship). We acknowledge the currency that this phrase has attained, but note that the use of "advantageous" is surplusage in the designation of a claim for interference with a contract. In light of the contractual relationship between Cachopa and the town, by virtue of either a collective bargaining agreement or an express employment agreement (as acknowledged later in the complaint's breach of contract count against the town), we conclude that the claim is one for intentional interference with a contractual relationship.

Pascarelli was an officer for the town police department who served as a court prosecutor in sequential special one-year appointments from 1991 to 2001. During that period, he frequently prosecuted cases concerning Goulston's store involving, for example, employee theft. After Cachopa was appointed chief in 2001, he refused to reappoint Pascarelli as court prosecutor. Pascarelli filed a grievance and told Cachopa, "[T]his is not going to end." In 2002 and 2003, Pascarelli reapplied for the position. Again Cachopa did not reappoint him. Goulston floated the idea that Pascarelli be appointed deputy police chief. In 2004, Pascarelli was elected to the board.

In 2002, the board voted to renew Cachopa's employment contract with the town. Goulston's was the only "no" vote. In defense of his vote during an open session, Goulston discussed the recent suicide of a department police officer. Goulston said that the officer's death was Cachopa's "fault" and that Cachopa "knew or should have known" that the officer was "in trouble." There was a public outcry in the town, resulting in votes of "no confidence" against Goulston from the police union and the Stoughton Professional/Administrative Employees Union. Goulston ultimately wrote a letter of apology and also apologized publicly.

In a June 22, 2004, session of the board, despite a question whether Cachopa's employment was governed by his employment contract or by a union agreement, selectman Robert Mullen stated flatly that Cachopa's employment was governed by the employment contract, due to expire on June 30, 2004, and moved for the contract to be renewed for three more years. Pascarelli, as an active member of the police force, abstained from the vote. Two selectmen voted in favor of renewal, but Mullen and Goulston voted against renewal. Goulston, as chair of the board, declared that the motion to renew had failed. Selectman Scott Carrara argued that Cachopa was still chief, but Goulston instructed the town manager to "notify the Chief, in accordance with the contract." After the session closed, Goulston directed the town manager to write a letter to Cachopa telling him that the two-to-two tie vote meant that his agreement was not extended under the terms of the employment contract, described as controlling. The town manager drafted the letter but refused to sign

it, and Goulston signed it instead. The letter further informed Cachopa that the board "voted not to extend your Employment Agreement" and that the agreement would expire on June 30, 2004.

On June 25, 2004, the town manager hand-delivered the letter to Cachopa. On June 27, Goulston called selectman Carrara and told him, "Tell [Cachopa] if he . . . puts Joe [Pascarelli] back as Court Prosecutor all of this will go away and he can go back in and be Chief." Carrara relayed the message to Cachopa. Finally, on June 28, Goulston told a police officer to tell Cachopa that "[i]f he gives Joe [Pascarelli] his job back as court prosecutor, he can get his job back and all of this will stop." The police officer relayed the message. On both occasions, Cachopa refused.

On June 29, Pascarelli moved to appoint Lieutenant David Chamberlain as interim chief and voted in favor of his motion. The motion passed three-to-two, with Goulston, Mullen, and Pascarelli voting in favor. On July 1, both Cachopa and Chamberlain reported to duty as police chief, but Cachopa resumed his previous position as a lieutenant.

Goulston and Mullen were removed from the board pursuant to a recall election in November, 2004. Shortly thereafter, the reconstituted board reinstated Cachopa as chief. In settlement of the resulting claim against the town, he received the differential in salary between the chief of police position and the lieutenant position, for the period during which he was lieutenant and not chief. We discuss additional evidence as it becomes relevant.

*Discussion.* To establish a claim of intentional interference with contractual relationship, Cachopa must show (1) that he had a contract with a third party, (2) that the defendants knowingly induced the third party to break that contract, (3) that the defendants' interference was improper in means or motive, and (4) that Cachopa was harmed by the interference. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 122 (2000). See also *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 476 (2001). We discuss each element in turn.

1. *Contractual relationship with a third party.* Neither Goulston nor Pascarelli contests this element and, indeed, it is clear that Cachopa had a contract with the town. We reject the defen-

dants' suggestion that Goulston and Pascarelli, as selectmen for the town, are indistinguishable from the town such that they cannot, in effect, interfere in a contract with another because the town cannot be considered a third party. See *Schinkel* v. *Maxi-Holding, Inc.,* 30 Mass. App. Ct. 41, 50 (1991) (party to contract cannot be found liable for interference with its own contract). Although Goulston and Pascarelli were members of the board of selectmen, there is no evidence that they controlled the operation of the town to the degree that they should be viewed as its alter ego. See *Harrison* v. *NetCentric Corp.,* 433 Mass. at 478.

2. *Interference by Pascarelli.* We next address whether Cachopa has provided evidence, sufficient to survive summary judgment, that Pascarelli knowingly interfered with his employment contract.[4] We conclude that Cachopa has met his burden.

Cachopa provides evidence that on June 29, 2004, Pascarelli moved to appoint Lieutenant Chamberlain as acting police chief, and voted in favor of his appointment. Before this vote, Cachopa was still chief. There was at least one selectman who believed that Cachopa's employment was subject to the union agreement and that, therefore, the earlier two-to-two vote on the motion to renew his previous contract was of no effect. Pascarelli's actions had the effect of resolving this dispute and ousting Cachopa as chief.[5]

3. *Improper means or motive.* To prove improper motive or means where the defendant is an official of the employer, the plaintiff must show that "actual malice," that is, a "spiteful, malignant purpose, unrelated to the legitimate [municipal] interest," was the "controlling factor" in the interference. *Black-*

---

[4]Goulston does not contest this element. He knowingly interfered through his conduct at the June 22 meeting and his subsequent letter to Cachopa.

[5]Cachopa has also proffered evidence suggesting that Pascarelli and Goulston were acting in concert and that Pascarelli is thus responsible for Goulston's actions. The line between speculation and reasonable inference is quite thin here, but we need not decide on which side of the line this case falls, as Pascarelli's action on June 29 was sufficient to maintain the cause of action. We note, in this context, that the motion judge properly disregarded the statements in selectman Carrara's affidavit, recounting descriptions by selectman Mullen of a conversation between Mullen, Goulston, and Pascarelli, as inadmissible hearsay.

*stone* v. *Cashman*, 448 Mass. 255, 261, 270 (2007) (citations omitted).

a. *Goulston.* Cachopa argues that, because Goulston was angry about the sting operations and Cachopa's failure to appoint Pascarelli as court prosecutor or deputy chief, Goulston retaliated and made defamatory statements about Cachopa, argued that Cachopa's employment was governed by his employment contract rather than by the union contract, improperly conducted the meeting in which the board failed to renew Cachopa's contract, and improperly sent out a letter informing Cachopa that his contract had not been renewed.

The situation is analogous to that in *McNamee* v. *Jenkins*, 52 Mass. App. Ct. 503 (2001). In *McNamee*, the plaintiff police sergeant had commented on the subordinate defendant police officer's performance deficiencies on numerous occasions. *Id.* at 509. The officer filed a grievance against the sergeant, accusing him (perhaps falsely) of making racial slurs. *Id.* at 507. The jury were permitted to infer that the officer did so with actual malice, in retaliation for the sergeant's comments about his performance. *Id.* at 509.

Here, Cachopa conducted a sting operation against Goulston's liquor store in 2000; this became an issue in Goulston's 2001 bid for selectman, which was unsuccessful. Then Cachopa refused to reappoint Goulston's friend Pascarelli as court prosecutor or appoint him as deputy chief. Finally, in 2002, Goulston was the subject of public outcry and "no confidence" votes by local unions when he voted against Cachopa's reappointment and accused him of causing another officer's suicide. The fact finder could reasonably infer that Goulston's subsequent actions in 2004 were in retaliation against these real or perceived wrongs and frustrations, and were made with actual malice. The extended pattern — beginning with Cachopa's actions, followed by Goulston's responses which generally failed to achieve their objective, leading in turn to increasing frustration, followed by escalation on the part of Goulston — if believed, easily raises the inference of malice.

Goulston argues that his removal of Cachopa was actually directed at protecting the interests of the town and that the "controlling factor" in his interference was thus not malice. He

points to several complaints he received from police officers about Cachopa's performance. Goulston's argument is undermined by his offer, despite his stated concerns, to reinstate Cachopa as police chief if Cachopa in turn reinstated Pascarelli as court prosecutor.[6] A determination as to credibility and weighing of this evidence is for the fact finder to make. For our purposes, in considering summary judgment, it is sufficient to note that malice could be inferred by the fact finder from these facts.

b. *Pascarelli.* Cachopa argues that Pascarelli was angry about Cachopa's refusal to reappoint him as court prosecutor in 2001, and retaliated by moving to appoint an interim chief of police while there was ongoing debate whether Cachopa was still chief. Cachopa proffers evidence that Pascarelli remained angry over this, making complaints to others, including telling John Dembrowski, a former selectman, "Manny fucked me." When Cachopa told Pascarelli that he would not be made deputy chief, Pascarelli stormed out of the room and stated that he wanted the job, and he "can get political." These reactions permit the inference that, when Pascarelli later moved to appoint an interim chief, he did so with "actual malice" toward Cachopa.

We recognize that neither "motivation of personal gain, including financial gain," nor "personal dislike" is generally enough to "warrant an inference of the requisite ill will." *King* v. *Driscoll,* 418 Mass. 576, 587 (1994) (where defendant board members fired plaintiff "intending to secure more power and monetary benefits for themselves," there was insufficient evidence of actual malice). However, nothing in the record suggests that Pascarelli knew or believed that Lieutenant Chamberlain, who was appointed as acting chief pursuant to Pascarelli's motion, would reappoint him as court prosecutor. The fact finder could thus infer that the controlling factor in Pascarelli's conduct was the desire for revenge.

4. *Economic harm.* A plaintiff must show economic harm to maintain an intentional interference action. See *Ayash* v. *Dana-*

---

[6]While an earlier proposal by Goulston to have Pascarelli appointed deputy chief arguably was intended to serve departmental interests by keeping Cachopa under closer surveillance, the repeated attempts by Goulston to resecure Pascarelli his job as court prosecutor provide no such rationale.

*Farber Cancer Inst.,* 443 Mass. 367, 394-395, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash,* 546 U.S. 927 (2005) (requiring economic harm for intentional interference with contractual relationship). Here, there is no question that Cachopa suffered economic harm when he received a lower income as lieutenant than he would have received had his contract been renewed, and that he continued to suffer this harm at the time he filed suit. At the time Cachopa filed his complaint, he had demonstrated harm sufficient to support a cause of action; at the same time he also advanced a claim for emotional distress damages, which are recoverable as consequential damages flowing from the interference. See *Draghetti* v. *Chmielewski,* 416 Mass. 808, 819 (1994) (permitting foreseeable damages for emotional distress on intentional interference action); *Ratner* v. *Noble,* 35 Mass. App. Ct. 137, 138 (1993) ("recovery for emotional distress is not allowed unless the elements of the [interference] tort are made out").[7] However, after this action commenced, the town settled the claims against it by paying Cachopa the salary differential for that period.[8] The question is whether Cachopa's receipt of the payment from the town either discharged his cause of action against Goulston and Pascarelli, or made it moot.

We are not aware of any principle of discharge that terminated Cachopa's cause of action, and the defendants have not argued any. See, e.g., Restatement (Second) of Torts §§ 896-900 (1979) (collecting grounds for termination of cause of action). See also Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975) ("The appellate court need not pass upon questions or issues not argued in the brief"). We also reject any mootness claims that are made by the defendants' suggestion that Cachopa ceased to have a personal stake in the case when he received

_____

[7] The evidence submitted by Cachopa suggests that his emotional distress was not only foreseeable, but perhaps even intended.

[8] The parties dispute whether Cachopa received interest on the back pay differential, and whether he paid interest on sums he allegedly borrowed to meet expenses during the period of his demotion. The record is silent on this issue, notwithstanding representations made by counsel during oral argument. Cachopa also argues that he suffered an economic loss since he no longer had use of the town's car. We do not address whether these injuries are economic harms that would alone be sufficient to justify a cause of action.

compensation for his economic harm. Although Cachopa has been compensated for his economic harm, he has not received any compensation for his emotional distress. This injury survives his settlement with the town, and his claims against Goulston and Pascarelli remain alive.

5. *Other issues.* a. *Massachusetts Tort Claims Act.* Under the Massachusetts Tort Claims Act, G. L. c. 258, § 10(*c*), municipalities are not liable for any claim arising out of an intentional tort, including intentional interference with a contractual relationship. However, Cachopa's claims are against Pascarelli and Goulston in their individual capacity and are thus not barred by governmental immunity. See *South Boston Betterment Trust Corp.* v. *Boston Redev. Authy.*, 438 Mass. 57, 69 (2002).

b. *Qualified immunity.* We reject the defendants' argument that the qualified immunity standard for civil rights actions applies to this action in tort. See, e.g., *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982); *Duarte* v. *Healy*, 405 Mass. 43, 46-48, 49 (1989) (Federal system of qualified immunity under 42 U.S.C. § 1983 [1982] applied to actions under Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I, but not to claims under Massachusetts Privacy Act, G. L. c. 214, § 1B). Public officials are, however, entitled to qualified immunity in the sense that they are not liable for negligence or other error in the making of a discretionary decision within the scope of their authority, so long as they act "in good faith, without malice and without corruption." See *Gildea* v. *Ellershaw*, 363 Mass. 800, 820 (1973). A showing that the defendants acted with actual malice would thus also defeat their claim of qualified immunity. See *Tobin* v. *Goggins*, 17 Mass. App. Ct. 996, 997 (1984) (citing *Gildea* in intentional interference case against public official, plaintiff must also show "that the interference was done in bad faith or maliciously"). As set out in part 3, *supra*, Cachopa has proffered evidence "from which a jury could infer that the defendants acted in bad faith or with malice," and consequently are not shielded from liability. *Nelson* v. *Salem State College*, 446 Mass. 525, 538 (2006).

c. *Absolute immunity.* Finally, we see no merit to the claim that the defendants' actions were protected by the speech and debate clause of the Constitutions of the United States and of

the Commonwealth. See art. 1, § 6, of the United States Constitution; art. 21 of the Massachusetts Declaration of Rights. Such immunity applies only to legislative activities, and Goulston's and Pascarelli's actions regarding Cachopa's employment were clearly not legislative, as they pertained to a specific situation and a specific individual. See *Sciuto* v. *Lawrence*, 389 Mass. 939, 943-944 (1983) ("the appointment of a particular person to an office is traditionally the function of the executive department"), citing *Commissioner of Admin.* v. *Kelley*, 350 Mass. 501, 505 (1966).

*Conclusion.* We reverse the grant of summary judgment to the defendants and remand the case to the Superior Court for further proceedings consistent with this opinion.

*Judgment reversed.*