Ricciardone, David, J.
The plaintiff in this action, Jose J. Latimer (“Latimer”), has filed claims against his former employer, Alternatives Unlimited, Inc. (“Alternatives”), and Alternatives’ former Human Resources Director, Thomas Wood (“Wood”) (collectively, “defendants”). Latimer alleges that the defendants wrongfully terminated him after questions arose regarding the accuracy of fellow employees’ timesheets. He asserts the following claims in his verified complaint: (1) Count I: express contract (against Alternatives); (2) Count II: implied contract (against Alternatives); (3) Count III: implied obligation of good faith and fair dealing (against Alternatives); (4) Count IV: violation of public policy — malevolent intent (against Alternatives); (5) Count V: interference with contract (against Wood); (6) Count VI: malice (against Wood); and (7) Count VII: defamation (against Wood). The action is now before the court on the defendants’ motion for summary judgment. For the following reasons, the motion is ALLOWED in part and DENIED in part.
BACKGROUND
The undisputed facts, and the disputed facts viewed in the light most favorable to Latimer as the non-moving party, are as follows.
I. The Events Surrounding Latimer’s Termination
Alternatives is a nonprofit corporation that provides services to individuals with developmental and psychiatric disabilities throughout central Massachusetts. Latimer began working at Alternatives in 1996 as a counselor. Alternatives promoted Latimer to program supervisor in 1997, and then to program coordinator in 1998.
The duties listed in the program coordinator job description include the following: (1) establishing “program goals/objectives that are keeping with Alternatives’ Mission and Goals and a plan to reach those goals through program evaluation, supervision, training and consultation”; (2) hiring, supervising, and evaluating program staff; and (3) “(t)rain(ing] new and existing staff in all facets of their job duties and arrangfing] for them to receive outside training as necessaiy.” Additionally, though it is not listed as one of the official duties under the program coordinator job description, Latimer testified that as program director, he was responsible for ensuring the accuracy of his subordinates’ timesheets.[2] Similarly, Wood testified that a program coordinator is responsible for auditing timesheets to ensure that employees are paid accurately.
The events leading up to Latimer’s termination are as follows. In 2006, Cindy Stephen (“Cindy"), a former member of Alternatives’ relief staff, was seeking unemployment assistance. The Massachusetts Division of Unemployment Assistance (“DUA”) held a hearing on Cindy’s application on November 13,2006. Though Wood normally attended DUA hearings, he could not attend Cindy’s hearing and instructed Latimer, who had been Cindy’s manager, to do so as Alternatives’ witness. At the hearing, Cindy testified that Latimer had permitted her to be out of work from May 2006 to September 2006 for a pregnancy-related illness, and that Latimer told Cindy that her husband, Kevin Stephen (“Kevin”), who was also an employee of Alternatives, could cover her shifts during her absence. Cindy asserted that Latimer told Kevin to fill out and sign Cindy’s timesheet rather than putting the shifts on his own timesheet. Latimer asserts in his verified complaint that he testified at the DUA hearing that Cindy’s allegations were not true, and that both she and Kevin had worked their respective assigned shifts at all times.[3]
It appears that Latimer did not inform Wood of Cindy’s testimony from this hearing. A second DUA hearing on Cindy’s unemployment assistance claim was held on July 5, 2007, at which time Wood learned of Cindy’s allegations regarding her timesheets. Wood took no action on Cindy’s allegations until mid-October 2007, when he received a call from Kevin, who told Wood that Cindy’s allegations at the DUA hearings were true.
Wood then scheduled a meeting with Latimer to discuss the Stephens’ allegations. The meeting took place on October 23, 2007, with Latimer, Wood, and Kelly Gamble Rice (“Rice”), the supervisor of Latimer’s supervisor, attending (“10/23/07 Meeting”). Rice’s only role at the meeting was as note-taker. During this meeting, Wood indicated that, if true, the Stephens’ allegations revealed wage violations by Alternatives for failing to pay Kevin overtime. He asked Latimer about the Stephens’ allegations, and Latimer denied that they were true. Latimer cited two other Alternatives employees who could purportedly support his side of the stray, but Wood stated that he would not talk to these employees because he felt he had enough information to credit the Stephens over Latimer. Wood also indicated that Latimer misunderstood Alternatives’ overtime policies. At some point in this meeting, Latimer stated that he had “made a mistake,” but he did not specify to what he was referring.
According to Wood, he gave Latimer two options at the end of the 10/23/07 Meeting: to resign in lieu of termination for falsifying Cindy’s timesheets or to accept a demotion for incompetence, i.e., for failing to understand Alternatives’ overtime policies. According to Latimer, however, Wood offered to demote Latimer, rather than terminate him, if he admitted that the Stephens’ allegations were true, i.e., if Latimer lied (according to Latimer’s version of the facts), and stated such before the relevant government wage and/or labor bodies. Latimer refused and the meeting ended *104 with no resolution. Latimer apparently went home to think about the situation and discuss it with his wife.
The next day, October 24, 2007, Latimer held another meeting with Wood and Rice, whose only role again was as note-taker (“10/24/07 Meeting”). Wood asked Latimer what he had meant the previous day when he stated he had made a mistake, and Latimer responded that he should have more closely reviewed the Stephens’ timesheets before signing them. He denied that the mistake was instructing Kevin to work Cindy’s hours and to falsify Cindy’s timesheets. At this point, Wood left the room and returned approximately thirty minutes later with a letter terminating Latimer’s employment and a check covering the remainder of what Alternatives owed Latimer.
II. Alternatives’ Personnel Policy Manual
Alternatives distributes to its employees a document titled “Personnel Policies Manual” (“Manual”). After the table of contents and an introduction page, the Manual contains a separate page titled “PURPOSE’ (formatting in original).[4] Under this heading, the Manual states that it
has been prepared for your information and reference. It is not intended to create nor be construed to constitute a contract between [Alternatives] and any or all of our employees. Employment is at will and may be terminated with or without cause, by either party, at any time. The terms of the policies, practices and guide-lines described herein are not conditions of employment and [Alternatives], represented by the Executive Director [sic] reserves the right to modify, revoke, suspend, terminate or change any or all such policies and guidelines in whole or in part, in general or as to any specific employee or group of employees, at any time, with or without notice.
Alternatives does not negotiate the terms of the Manual with employees, and did not do so with Latimer. When Alternatives distributes a new edition of the Manual, it requires its employees to sign an acknowledgment of receipt of the new edition with incorporated changes. It is undisputed that Latimer signed such an acknowledgement regarding the most recent edition of the Manual issued before his termination.[5] During his deposition, Latimer testified in a somewhat contradictory manner about how often he reviewed the Manual, but, when pressed, he finally stated that he only reviewed it when Alternatives issued a new edition.
The “Employment Policies & Procedures” section of the Manual contains the following polices, among others: Discipline, Grievance/Appeal, and Non-Judgmental Suspension/Termination.[6] The Discipline policy provides for a progressive four-step process, the first step being a verbal warning, the second a written warning, the third probation, and the fourth termination. Under the Grievance/Appeal policy, an employee may initiate the grievance/appeal process for, among other things, a termination decision, but the employee must initiate the process in writing within five days of the termination. Finally, under the Non-Judgmental Suspension/Termination policy, Alternatives “may, at any time, terminate ... an employee if he or she is accused or suspected of serious misconduct whether or not the allegations can be proven.” Reasons for termination include any “activity which adversely affects the well-being of people served, the safety or morale of other employees, the agency or its reputation.”
DISCUSSION
I Summary Judgment Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Kourouvacilis, 410 Mass. at 716. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, 404 Mass. at 17. The court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. See Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Analysis
Latimer asserts numerous claims against both Alternatives and Wood, which the court will address separately.
A. Count I: Express Contract and Count II: Implied Contract (Against Alternatives)
Latimer appears to base both Count I and Count II on the Manual, claiming that it amounts to an express and/or implied contract of employment. The court finds there are genuine issues of material fact regarding whether the Manual constitutes a contract, but it nonetheless concludes that the defendants are entitled to summary judgment because there is no evidence that Alternatives breached any of the Manual’s policies.
An employee manual may form the basis of an express or implied contract. See Jackson v. Action For Boston Community Dev., Inc., 403 Mass. 8, 13 (1988). The key inquiry is whether, in light of the context of *105 the manual’s preparation and distribution, as well as its specific provisions, it would be objectively reasonable for an employee to regard the manual as a legally enforceable commitment concerning the terms and conditions of employment. See O’Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 694 (1996). Though “not a rigid list of prerequisites,” id. at 692, the following factors may be considered in determining whether an employee manual constitutes a contract: (1) whether the employer retains the unilateral right to change the manual’s terms; (2) whether the manual states that it is meant only as guidance on the employer’s policies; (3) whether the employee negotiated the terms of the manual; (4) whether the manual provides for a term of employment; (5) whether the employer calls special attention to the manual; and (6) whether the employee signs or otherwise assents to the terms of the manual or acknowledges that he understood its terms. See Jackson, 403 Mass. at 14-15.
Several of the factors listed above support a conclusion that the Manual cannot be viewed as a contract. In particular, it is undisputed that Latimer did not negotiate the terms of the Manual, that Alternatives explicitly retained the right to unilaterally change the Manual’s terms, and that the Manual does not provide for a term of employment. Also of relevance is the fact that the Manual’s Purpose states that “(e)mployment is at will and may be terminated with or without cause, by either party, at any time.”
In support of the opposite conclusion is the fact that Alternatives called special attention to the Manual by updating it every few years and by stating in the Manuals’ Introductions that “(t]he Board of Directors, Executive Director and entire Management Team are strongly committed to the fair and ethical treatment of employees and consistent administration of these policies.” Further, every time Alternatives issued a revised edition of the Manual, each of its employees had to sign a form acknowledging that he had read the revised edition, “underst(ood) the content of the revised manual,” and “had the opportunity to discuss it with [his] supervisor.” It is undisputed that Latimer signed such an acknowledgment form for the most recent revised version of the Manual issued before his termination.
While the Purpose section of the Manual explicitly disclaims the creation of a contract between Alternatives and its employees and also states that the terms of the Manual are not conditions of employment, the Introduction section specifically lays out a reciprocal relationship between Alternatives and its employees. In particular, the Introduction section states that the senior management of Alternatives is committed to treating its employees fairly and to applying the Manual’s policies consistently, and then states, “[r]eciprocally, it is expected that employees will conduct themselves in a professional manner, and will contribute to promoting and sustaining a positive image of the agency and the people we serve within the community we serve.”[7]
Based on all these factors, Latimer could reasonably have relied on the Manual as containing the terms and conditions of his employment, giving rise at least to an implied contract. A trier of fact would normally be required to make the objectively reasonable determination here, except that there is no evidence that, even if the Manual could be treated as a contract, Alternatives breached any of the Manual’s policies.
Latimer asserts that Alternatives — via Wood — violated two of the Manual’s policies. The first is the Discipline policy, which provides for four stages of progressive discipline: verbal warning; written warning; probation; and termination. Latimer claims that his immediate termination violated this policy because none of the prior disciplinary steps had been taken. The policy specifically provides, however, that “in the event of [sic] severe problem or breach of conduct, certain steps will be waived.” It also provides that where “a problem or incident is clearly of such a serious nature that it poses a threat to . . . the agency as a whole, . . . termination may be immediate.” Wood testified as to the serious nature of the conduct that led to Latimer’s termination, and stated that he waived the three prior steps of progressive discipline because of the severity of Latimer’s conduct. Thus, it was not a breach for Wood to terminate Latimer without going through the previous three steps of discipline. See Terravecchia v. Fleet Bank, 2007 WL 1056818 at *3 (Mass.Super. 2007) [22 Mass. L. Rptr. 314] (where discipline policy permitted employer to bypass one or more of the progressive steps, jump to step three did not violate terms of manual).
Latimer also cites the Non-Judgmental Suspension/Termination policy as having been violated. Specifically, he claims that there was no recommendation for termination from Latimer’s supervisor, and that Alternatives’ executive director did not finally approve the termination. According to the policy, a termination recommendation is not mandatory; rather, a supervisor “should” make one. Further, it was not Latimer’s supervisor who was involved in the DUA hearings and who had been in contact with Kevin. That person was Wood, and, based on the knowledge he had at the time, Wood decided to terminate Latimer. The fact that Wood did not inform the executive director of the termination until after it had already occurred is immaterial where there is no evidence that the executive director would not have approved the discipline.[9]
Latimer also argues that the loss of Rice’s notes from the two termination meetings in October 2007 violated the Non-Judgmental Suspension/Termination policy because the policy requires that “[a]ll documentation ... would be placed in the personnel file.” Even overlooking the fact that the wording of this provision is unclear as to the compulsory nature of the *106 filing of relevant documentation, Latimer has not shown how the absence of the notes has caused him harm as to his breach of contract claims. Perhaps if Latimer had taken advantage of the Grievance/Appeal Policy and appealed his termination those notes would have proved useful, but he did not do so.
Finally, Latimer complains more generally about the fact that Wood failed to conduct an investigation into the Stephens’ allegations against him, including choosing not to talk to two witnesses Latimer named as having information about whether Cindy worked between May 2006 and September 2006. Even viewing the evidence in the light most favorable to Latimer and assuming that he did not instruct Kevin to falsify Cindy’s time sheets, there has been no violation of the Non-Judgmental Suspension/Termination policy where that policy does not require that the Stephens’ allegations be proved true before Wood could terminate Latimer.[10] The policy explicitly permits Alternatives to terminate an employee “if he or she is accused or suspected of serious misconduct whether or not the allegations can be proven!' (emphasis added). Wood’s failure to investigate therefore did not constitute a breach, either.
Where Latimer has failed to show a breach of the Manual — even assuming the Manual could be considered as a contract and the Stephens’ allegations are not true — the defendants are entitled to summary judgment on Count I and Count II of Latimer’s complaint.
B. Count III: Implied Obligation of Good Faith and Fair Dealing (Against Alternatives)
Latimer concedes in his opposition memorandum that he does not have an implied covenant claim based on Alternatives’ failure to properly compensate him for past work. See York v. Zurich Scudder Invs., Inc., 66 Mass.App.Ct. 610, 615-16 (2006) (discussing types of unfair compensation claims under implied covenant). He argues under Count III that the implied covenant— which protects contracting parties’ expectations, see Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991) — nonetheless applies in aid of interpreting the contract between himself and Alternatives. [11]
In the employment context, however, the implied covenant applies only to situations where the employer has wrongfully deprived the employee of earned compensation. See York, 66 Mass.App.Ct. at 615-16; see also McCone v. New England Tel. & Tel. Co., 393 Mass. 231, 234 (1984) (“In awarding damages for breach of the implied covenant of good faith and fair dealing, ‘[o]ur goal is and has been simply to deny to [the employer] any readily definable, financial windfall resulting from the denial to [the employee] of compensation for past services’ ” (citation omitted)). Latimer has not cited, and the court has not located, a case where a court has applied the implied covenant of good faith and fair dealing generally to interpret an employment contract. As such, Count III fails as a matter of law.
C. Count IV: Violation of Public Policy— Malevolent Intent (Against Alternatives)
Under Count IV, Latimer alleges that Alternatives terminated him in violation of a public policy because he refused to lie and admit to the Stephens’ allegations regarding their timesheets. The court concludes that there are genuine issues of material fact precluding entry of summary judgment on Count IV.
“As an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, we have recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy.” King v. Driscoll 418 Mass. 576, 582 (1994). While it is somewhat difficult to decipher exactly what public policy Latimer relies on here, it seems to be the policy against testifying falsely, which was recognized in DeRose v. Putnam Mgt. Co., 398 Mass. 205, 210-11 (1986) (jury could have found that employer terminated employee for failing to implicate co-employee during testimony, as employer requested). Latimer asserts, inter alia, that Wood terminated him at the 10/24/07 Meeting when Latimer refused to admit and testify to the truthfulness of the Stephens’ allegations, which, based on Latimer’s position that he did not falsify the timesheets, would have been false testimony.[12]
There is evidence in the record supporting Latimer’s assertions. In his verified complaint — which the court treats as an affidavit for purposes of summary judgment, see Godbout v. Cousens, 396 Mass. 254, 262 (1985), Latimer states that Wood told Latimer that he would only be demoted, rather than terminated, if he agreed to the truthfulness of the Stephens’ allegations before government authorities (e.g., a labor board). See Curran v. Stop & Shop Cos., 1996 WL 1329390 at *3 (Mass.Super. 1996) (employee’s public policy claim failed where no evidence that supervisor “was trying to create a quid pro quo in which [the employee] would be pressured to testify falsely to retain her job”). The summary judgment record contains numerous other statements of Latimer’s in which he asserted that Wood asked him to admit to the allegations.[13]
There is also evidence that Alternatives may have terminated Latimer because of his refusal to testify as Wood requested. See Mello v. Stop & Shop Cos., 402 Mass. 555, 560-61 (1988) (employee’s public policy claim failed in part because no evidence that but for employee’s protected conduct, he would not have been terminated). In his deposition testimony, Latimer stated that when he told Wood during the 10/24/07 Meeting that he would not lie for him, Wood became upset. He also testified that when he informed Wood that he would not change any timesheets as Wood requested, thereby again refusing to admit to the Stephens’ allegations, Wood told him “okay, you all *107 done, wait here," and then Wood returned approximately thirty minutes later with Latimer’s termination letter.
Considering this evidence in the light most favorable to Latimer, the court concludes that Latimer has met his burden in opposing summary judgment on Count IV.[14]
D. Count V: Interference With Contract and Count VI: Malice (Against Wood)
Reading these two counts together results in the assertion of one claim: tortious interference with Latimer’s employment contract, asserted against Wood. An intentional interference with contract claim requires a demonstration of the following elements: (1) Latimer had an employment contract with Alternatives; (2) Wood knowingly induced Alternatives to breach that contract; (3) Wood’s interference was intentional, and improper in motive or means; and (4) Wood’s actions harmed Latimer. See Cachopa v. Stoughton, 72 Mass.App.Ct. 657, 660 (2008). Because Latimer asserts the claim against an official of Alternatives, he must show, regarding the “improper motive or means” element, that Wood acted with actual malice, i.e., “a spiteful, malignant purpose, unrelated to the legitimate corporate interest of the employer.” Weber v. Community Teamwork, Inc., 434 Mass. 761, 781-82 (2001) (citation and internal quotations omitted). Further, Latimer must show that such actual malice was the controlling factor in Wood’s interference. See id. at 781. The court concludes that Latimer has made such a showing on summary judgment.[15]
Termination in violation of a public policy may constitute actual malice. See Falcon v. Leger, 62 Mass.App.Ct. 352, 363-65 (2004) (denial of judgment notwithstanding verdict motion as to employee’s interference claim affirmed where evidence supported conclusion that employer terminated employee for refusing to interfere with inspection that protected public safety, in violation of public policy). The court has already determined above that there is sufficient evidence in the summary judgment record to permit Latimer’s public policy claim to be submitted to a trier of fact. As such, it follows that his intentional interference claim must also be submitted to a trier of fact to determine whether, by a preponderance of the evidence, the controlling factor in Wood’s termination of Latimer was the latter’s refusal to testify falsely about wage violations.[16]
Counts V and VI therefore survive the defendants’ summary judgment motion.
E. Count VII: Defamation (against Wood)
Latimer’s defamation claim is based on Wood allegedly calling Latimer a “liar” numerous times during the 10/23/07 Meeting, in front of Rice.[17] The basic elements of a defamation by slander claim are “the publication of a false and defamatory statement by spoken words of and concerning the plaintiff.” Ellis v. Safety Ins. Co., 41 Mass.App.Ct. 630, 635 (1996); Restatement (Second) of Torts §§558, 568 (1977). A statement is defamatory if it “discredits the plaintiff ‘in the minds of any considerable and respectable segment in the community.’ ” Draghetti v. Chmielewski, 416 Mass. 808, 811 (1994) (citation and internal quotations omitted). Publication requires transmission of the defamatory statement to at least one person other than the plaintiff. See Phelan v. May Dept. Stores Co., 443 Mass. 52, 56 (2004).
Latimer’s defamation claim fails because the term “liar” is not defamatory where it expresses the defendant’s mere opinion rather than fact. See King v. Globe Newspaper Co., 400 Mass. 705, 708 (1987) (statements of pure opinion cannot form basis of defamation claim); Lyons v. New Mass Media, Inc., 390 Mass. 51, 60-61 (1983), citing Edwards v. National Audubon Society, Inc., 556 F.2d 113, 121-22 (2d Cir. 1977) (distinguishing between assertions of being paid to lie and merely lying where former can be proved true or false whereas latter epithet “merely expressed an opinion which cannot be held libelous however mistaken the opinion might be”).
Even if calling Latimer a “liar” amounted to a defamatory statement, Wood, as an official of Alternatives, enjoyed a conditional privilege “to disclose [to Rice] defamatory information concerning [Latimer] when the publication is reasonably necessary to serve [Alternatives’] legitimate interest in the fitness of [Latimer] to perform his . . . job.” Foley v. Polaroid Corp., 400 Mass. 82, 94 (1987) (citation omitted). Wood allegedly made the defamatory statements during a meeting in which Wood was questioning Latimer about allegations that he had falsified company records. Wood, and by extension, Alternatives, clearly had a legitimate interest in determining whether Latimer was fit to continue his job as program coordinator in light of these allegations.
Further, Wood did not lose the conditional privilege by publishing the statements unnecessarily, unreasonably, or excessively.[18] See id. at 95. The only alleged publication here was to Rice — another Alternatives official who shared Wood’s interest in determining Latimer’s fitness for continued employment — during a private meeting. Further, Wood could not have called Latimer a “liar” in reckless disregard for the truth of that statement, see Foley, 400 Mass. at 95 (conditional privilege may be lost where statement published with reckless disregard for truth), where the facts before Wood essentially presented a “he said/she said” situation, and he could choose to believe only one side.
Count VII therefore fails as a matter of law.
ORDER
Based on the foregoing, it is hereby ORDERED that the motion for summary judgment of Alternatives Unlimited, Inc. and Thomas Wood be ALLOWED as to *108 Count I, Count II, Count III, and Count VII, and be DENIED as to Count IV and Counts V/VI (which the court treats as asserting one claim).

 The court assumes that the use of the term “program director” was intended to refer to the same position as “program coordinator.”

 In his verified complaint, Latimer also asserts that he did occasionally permit Kevin to work Cindy’s shifts when she experienced morning sickness, but that he did not tell Kevin to put his hours on Cindy’s timesheet.

 The copy of the Manual contained in the summary judgment record appears to be from 2006, as it indicates that the most recent revision was in August 2006. Thus, it is not necessarily the same version that was in effect when Latimer was terminated in 2007. Nonetheless, the court relies on this version of the Manual where both Latimer and the defendants rely on it and quote from it as the authoritative version.

 The acknowledgement form Latimer signed stated the following: “I have read [Alternative’s] Personnel Policies Manual, and the summary of revisions made as of 8/2003. I understand the content of the revised manual and have had the opportunity to discuss it with my supervisor. Additionally, any questions I have about the agency’s Personnel Policy have been addressed through this process.” The court notes that though both parties agree in their consolidated statement of facts that the most recent edition of the Manual in existence before Latimer’s termination was issued in 2004, the Manual in the summary judgment record indicates that there was a revision in August 2006. See supra note 4. The inconsistency appears immaterial, however, and neither party mentions it.

 These and other relevant portions of the Manual will be discussed in more detail below.

 Additionally, it is unclear whether the Manual provides only guidance on Alternatives’ policies, or whether it could be understood as setting forth detailed and mandatory mutual obligations, where it both states that the Manual “has been prepared for your information and reference” and that it “is intended to set forth the personnel policies and procedures of the agency in a straightforward, comprehensive manner so they may be uniformly understood by all employees.” See O'Brien, 422 Mass. at 693.

 In fact, in one of his interrogatory answers, Wood stated that when he informed the Executive Director of Latimer’s termination and the reason for it, the Executive Director did not object to the termination.

 Similarly, this policy does not require Alternatives to look at the employee’s personnel file or performance evaluations before terminating him or her. Wood’s failure to do so therefore cannot constitute a breach.

 Because the court has concluded that a trier of fact could determine that the Manual constituted a contract between Alternatives and Latimer, Latimer’s implied covenant claim need not be rejected for lack of the required underlying contract. See Blank v. Chelmsford Ob/Gyn., P.C., 420 Mass. 404, 407-08 (1995) (employment contract includes implied covenant).

 The public policy exception applies to at-will employees. While the court concluded above that the Manual may have constituted a contract between Latimer and Alternatives— thereby removing Latimer’s at-will status — it is possible that the trier of fact will not find a contract.

 For example, in his interrogatory answers, Latimer stated that the evidence shows that Wood discouraged him from testifying honestly before a government agency under threat of discharge.

 The defendants argue that Latimer’s public policy claim is preempted by applicable statutory remedies under the Fair Labor Standards Act and the Massachusetts Wage Act. See Melley v. Gillette Corp., 19 Mass.App.Ct. 511, 511-13 (1985) (employee’s public policy claim failed where comprehensive statutory remedy available under G.L.c. 151B). Neither of the statutory remedies the defendants cite apply here, though, where Latimer has not sought to assert any rights on behalf of himself or anyone else. See 29 U.S.C. §215(a)(3) (protecting employee who flies complaint or institutes proceeding under statute, or who testifies in such proceeding); G.L.c. 149, §148A (same).
Further, it cannot be said that Latimer testified or was about to testify in any such proceeding, as his public policy claim is based on the fact that Alternatives allegedly terminated him for refusing to testify as Wood demanded.

 As to the first element of an interference claim, as discussed above, the evidence may support the existence of a contract between Alternatives and Latimer based on the Manual. Further, there is no question that Wood knowingly interfered with any potential contract, as he was the one that terminated Latimer, or that Latimer suffered damages as a result of Wood’s conduct where he lost his job.

 There is no evidence in the record that Wood acted with actual malice by retaliating against Latimer, see Cachopa v. Stoughton, 72 Mass.App.Ct. 657, 662-63 (2008) (fact finder could infer that defendant acted with actual malice by retaliating against plaintiff for perceived wrongs), or by acting outside of his official role at Alternatives out of resentment of Latimer, see O'Brien, 422 Mass. at 688-90 (“Screaming at an employee repeatedly to Humiliate her in front of other employees, calling her names, and denying her work to do when work is available could be found both to exceed the protected conduct of a supervisor and to constitute malicious conduct unrelated to an employer’s legitimate business interests”). Additionally, Wood’s failure to investigate fully the Stephens’ allegations by refusing to speak with Latimer’s cited witnesses amounts to “sloppy and unfair business practices” at most, Weber, 434 Mass. at 783, and more likely cannot form the basis for actual malice where the Non-Judgmental Suspension/Termination does not require that allegations be proved. Any evidence that Wood called Latimer a liar during the 10/23/07 Meeting (which the defendants deny), however, may support an inference of actual malice based on violation of a public policy.

 In his complaint, Latimer also alleges that Wood made written defamatory statements, but in his deposition, he acknowledged that Wood made no such writings.

 In his deposition, Latimer testified that Wood acted recklessly by starting the 10/23/07 Meeting abruptly with no greeting to Latimer and by loudly stating the Stephens’ allegations and his own view on those allegations. This does not as a matter of law amount to such recklessness as to vitiate Wood’s conditional privilege.

 In his complaint, Latimer claims that Wood did not determine, state, or find that Latimer’s conduct was “clearly” of such a serious nature so as to warrant an immediate termination. As noted, though, Wood testified about the serious nature of Latimer’s conduct. Further, neither the Non-Judgmental Suspension/Termination policy nor the Discipline policy require that the terminated employee receive a statement that his wrongful conduct was clearly of such a serious nature. All the former requires is written notice to the terminated employee that includes an explanation for the termination. Wood fully complied with this requirement by giving Latimer written notice at the time of the 10/24/07 Meeting that stated Latimer was being terminated for “dishonesty and falsification of agency records [sic] specifically timesheets.”